UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LINE-X FRANCHISE DEVELOPMENT CORPORATION, | § § § |
| Plaintiff, | § CIVIL ACTION NO. H-06-2081 |
| v. | § § |
| FRED SCHULTZ, | § § |
| Defendant. | § § |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiff's Motion for Summary Judgment. After considering the parties' filings and the applicable law, the Court finds that the motion, Docket No. 20, should be and hereby is **GRANTED.**

## I.   BACKGROUND

This case revolves essentially around a contract dispute. Plaintiff Line-X Franchise Development Corporation is a California company that operates and licenses others to operate businesses that apply a protective polyurethane finish to truck beds. The products and methods associated with this finish are identified by the name brand "Line-X"; Plaintiff owns two federal registrations for the service mark "Line-X," and franchises the brand. Plaintiff is authorized to do business in Texas and maintains a substantial distribution center there.

Defendant Fred Schulz[1] is a Texas resident. On August 13, 2004, Defendant entered into three identical franchise agreements (the "Agreements") with Plaintiff, each

---

[1] Although the caption of the case identifies Defendant as "Fred Schultz," there is evidently no "t" in the correct spelling of his last name.

1

for a different business location in Houston, Texas.  The first page of each Agreement[2] identifies "Fred Schultz dba The Truck Store, Inc. #1," "Fred Schultz dba The Truck Store, Inc. #2," and "Fred Schultz dba The Truck Store, Inc. #3," respectively, as the "Franchisee."  The last page of each Agreement is signed by "Fred Schulz," with the title "President" hand-written under Defendant's signature.  Each Agreement also appends a "Guarantee and Assumption of Obligations" made out to "Fred Schultz, an individual"; the Guarantees all indicate that Schulz owned 100% of each franchise.

Defendant appears earlier (in February 2004) to have signed a document titled "Offering Circular" for each Agreement.  The Circulars each affirm that Defendant received a certain set of materials, including the Agreements themselves.  Finally, on the date he signed the Agreements (August 13, 2004), Defendant signed another trio of documents (labeled "Exhibit E to Offering Circular, Franchisee Disclosure Questionnaire"), in which he confirmed, *inter alia*, that he had received, reviewed, and understood each Agreement and the Offering Circulars.

The Agreements granted each of Defendant's business locations a license to use the Line-X marks, products, and system, as well as authorizing Defendant to purchase proprietary Line-X brand products.  Under the Agreements, Defendant was required to purchase the products either directly from Plaintiff or from an authorized designee, and was prohibited from using any unapproved products.  Each Agreement stated that it would be effective and binding for an initial term of five years, with the possibility of subsequent renewal.  However, Plaintiff retained the right to terminate the Agreements if

---

[2] Plaintiff has submitted only one full-length copy of what appears to be a complete forty-five page Agreement, for Store #1; for the second and third stores, Plaintiff submits a truncated version of the Agreement, including pages 1, 2, 4, 39, 45, and a Guarantee and Assumption of Obligations.  *See* Pl.'s Mot. Summ. J., Exs. 2-4.

Defendant, as Franchisee, "[f]ails or refuses to make payments of any amounts . . . for advertising contributions, purchase from Franchisor . . . or any other amounts due to Franchisor . . . and does not correct such failure or refusal within ten (10) business days after written notice of such failure is delivered to Franchisee." Pl.'s Mot. Summ. J., Ex. 2 ["Agreement No. 1"] at XVII.E.1.

The full-length, forty-five page version of the Agreement also delineates certain terms governing the transferability of interests relating to the franchises. Under the Agreement, "[n]o Franchisee . . . without Franchisor's prior written consent, by operation of law or otherwise shall sell, assign, transfer, convey, give away or encumber to any person, firm, corporation or other entity, all or any part of its interest in this Agreement or its interest in the franchise granted hereby . . . Any purported assignment of Franchisee's rights herein not having the aforesaid consent shall be null and void and shall constitute a material default hereunder." Agreement No. 1 at XIX.B.1.

On March 1, 2006, Plaintiff sent Defendant a "Notice of Intent to Terminate Franchise," stating that Defendant owed Plaintiff over $96,000 for Line-X products that had been ordered between July and December 2005 and never paid for. The letter instructed Defendant to pay the owed amount within thirty days. Defendant, however, never responded. On April 13, 2006, Plaintiff sent a "Notice of Termination of Franchise,"[3] informing Defendant that he was in breach of the Agreements due to his failure to pay the requested amount. The letter stated that because of Defendant's "continuing default," the Agreements were being terminated, and that Defendant was "no

---

[3] Both the Notice of Intent to Terminate and the Notice of Termination were addressed to all of the following: "Mr. Fred Schultz, dba The Truck Store #1," "Mr. Fred Schultz, dba The Truck Store #2," and "Mr. Fred Schultz, dba The Truck Store #3."

3

longer authorized to use the name Line-X in [his] business name, literature, and advertising, or to hold [himself] out as an authorized Line-X franchisee."

At the heart of this suit as it was filed in June 2006 is Plaintiff's contention that Defendant continues to own and operate at least one of the three business locations[4] as a polyurethane coating services business, using the Line-X service marks, signs, advertising materials, etc. Plaintiff asserts upon information and belief that the actual products being used at these businesses, however, are not made by Line-X, but by a competitor. The Complaint states claims for: 1) a declaratory judgment that the Agreements were validly terminated; 2) service mark infringement under the Lanham Act for Defendant's unauthorized, continued use of the Line-X marks; 3) federal trademark counterfeiting; 4) federal unfair competition; 5) common law unfair competition; 6) breach of contract with regard to Defendant's post-termination obligations under the Agreements; 7) action on an open account for the unpaid invoices; 8) breach of contract with regard to the due and owing amounts, plus contractual interest at 1.5% per month; and 9) unjust enrichment from unauthorized use of the Line-X marks and system. At the time the suit was filed, Plaintiff also applied for injunctive relief against Defendant, but at Plaintiff's motion, no hearing on the issue was ever held, and no injunctive relief granted.[5]

Defendant does not dispute any of the specific facts set forth above,[6] but nevertheless paints a very different picture of the relevant events. According to

---

[4] The Complaint alleges that Defendant still owns and operates Store #3, and that he either owns and operates Stores #1 and #2 as well, or that he has conveyed them to third parties.

[5] In its Motion to Continue Hearing on Preliminary Injunction, Plaintiff stated that "LFDC recently deposed Defendant, Fred Schultz. The deposition raised legitimate questions of fact that must be further investigated before LFDC can proceed with its Application for Preliminary Injunction." *See* Docket No. 10.

[6] As discussed further below, however, Defendant would likely object to any reference to the forty-five page Agreement as the "complete" Agreement.

4

Defendant, he entered into the three franchise agreements with Plaintiff not as an individual, but as an agent for a business named the "Truck Store, Inc.," which had been incorporated since July 11, 2002.[7]  Before August 2004, Defendant contends that the Truck Store sold Line-X products under an informal licensing agreement with Plaintiff, but in 2004, Plaintiff required all licensees to become franchisees in order to continue selling those products.  Therefore, Defendant signed the Agreements on August 13, 2004 as an agent for the Truck Store.

Defendant claims that at the time of signing, he was presented not with three complete, forty-five page Agreements (such as the one attached as Exhibit 2 to the summary judgment motion), but only with the abbreviated five-page versions submitted by Plaintiff as Exhibits 3 and 4.  Therefore, Defendant reasons, no provisions absent from the five-page version of the Agreement, including the provisions regarding transferability of interest, govern his contractual relationship with Plaintiff.   Further, Defendant states that he has conveyed each of the three business locations to third parties.  On July 22, 2005, two of the stores were sold to two brothers (the Fitzgeralds).  In May 2006, the third location was sold to a company named Dealer Select.  According to Defendant, at the time the suit was filed, not only were all three locations no longer in his hands, but the Fitzgeralds also "owned all the stock of the Truck Store Inc."

Defendant alleges that when he transferred the first two stores to the Fitzgeralds, the Line-X representative assigned to the Truck Store (Andrew Huber) was aware of and approved the transaction.  Additionally, Huber continued to accept orders for Line-X product from the new owners with the knowledge that the Fitzgeralds, not Defendant,

---

[7] An entity name search appended by Plaintiff to its summary judgment motion does show Defendant's business registered under "The Truck Store, Inc."

would be responsible for payment.  In an affidavit, Defendant further alleges that Huber "advised me that he would take care of doing all the paper work to ensure that I would not be responsible for payment for any product sold to the Fitzgerald Brothers at the two locations being purchased by the Fitzgerald Brothers."  The affidavit also states that another Line-X representative (Tim Mahoney) stopped sending bills for the first two locations to Defendant after those stores were sold to the Fitzgeralds.

Plaintiff now moves for summary judgment on its breach of contract claim. Although the motion requests only partial summary judgment, Plaintiff indicates that if the motion is granted, it will dismiss all remaining claims.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.  Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id.*

6

**B. Analysis**

Plaintiff moves for summary judgment on its breach of contract claim, arguing that "Schulz breached his agreement with LFDC by failing to pay for the LINE-X product purchased by and delivered to his franchised stores. He has failed to pay LFDC $96,908.39."[8] Pl.'s Mot. Summ. J. 4. Plaintiff seeks damages in the amount of $96,908.39, contractual prejudgment interest at the rate of 1.5% per month from April 13, 2006 until the date of judgment,[9] post-judgment interest, and attorneys' fees and costs. In Texas,[10] the elements of breach of contract are: 1) the existence of a valid contract, 2) the plaintiff's performance or tendered performance, 3) the defendant's breach of the contract, and 4) damages as a result of the breach. *E.g.*, *Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 923 (Tex. App. 2006); *Prudential Secs., Inc. v. Haugland*, 974 S.W.2d 394, 397 (Tex. App. 1998). In this case, much of the dispute between the parties centers around the first element, the existence of a valid contract.

<u>Which contract governs?</u>

The initial question that the Court must address is the most obvious: which contract applies, the forty-five page version submitted with the summary judgment motion as Exhibit 2, or the five-page version attached as Exhibits 3 and 4? For the below

---

[8] Plaintiff does not identify exactly which section of the Agreements Defendant allegedly violated by failing to pay for Line-X products. However, the following passages appear to be relevant. *See* Agreement No. 1 at XI.E ("Franchisee shall promptly pay all sums owing to Franchisor and any Related Entities and all advertising and promotional funds, and cooperatives including interest on overdue monies. Franchisor shall be entitled, including without limitation of rights or remedies, to refuse to sell and deliver Trademarked Products and other items to franchisees who are delinquent in payment of any amounts due."); *id.* at XVIII.F (upon expiration or termination of the Agreement, "Franchisee shall promptly pay all sums owing to Franchisor and Master Franchisee.").

[9] The Agreement provides that "amounts due for purchases by Franchisee from Franchisor . . . shall bear interest after due date at the one and one-half percent (1.5%) per month or the highest applicable legal rate for open account business credit allowed under applicable law." Agreement No. 1 at XI.B.

[10] Neither party disputes that Texas law governs the instant case.

7

reasons, the Court finds that the forty-five page contract governs the franchising relationship between Plaintiff and Defendant.

First, it is undisputed that Defendant signed not only all three Agreements, but also two other sets of documents – the Offering Circulars and the Franchisee Disclosure Questionnaires – verifying explicitly that he had read, received, and understood the Franchise Agreement and each exhibit thereto.  Pl.'s Mot. Summ. J., Exs. 9, 10.  The date on the Offering Circulars indicates that Defendant signed them on February 4, 2004, long before he signed the Agreements themselves.  Further, Defendant stated in his deposition that he knew before he signed the Agreements that he could access them on the Line-X website.  Pl.'s Mot. Summ. J., Ex. 11 at 51.  Plaintiff simply chose not to visit the website and read the Agreement before he signed it.  *Id.*  In Texas, it is clear that "a signatory to a contract is presumed to be aware of its contents."  *EZ Pawn v. Mancias*, 934 S.W.2d 87, 90 (Tex. 1996).  Further, "[a]bsent fraud, misrepresentation or deceit, a party is bound by the terms of the contract he signed, regardless of whether he read it or thought it had different terms."  *In re McKinney*, 167 S.W.3d 833, 835 (Tex. 2005) (citing *Mancias*).

Defendant claims in his motion that "Plaintiff represented to Defendant that the document Defendant was being asked to sign, on behalf of the Truck Store, Inc., was the complete agreement.  Defendant was not aware of any additional pages."  Def.'s Resp. 6. Plaintiff correctly points out, however, that Defendant nowhere denies that he was provided with the entire Agreement – or at least directed to it on the Line-X website – *before* August 13, as his signing of the Offering Circulars on February 4 appears to affirm.  Further, the five-page "version" of the Agreement is quite easily identifiable as incomplete; the page numbers are non-contiguous (numbers 1, 2, 4, 39, and 45) and the

8

text on the pages is similarly interrupted.  Defendant's suggestion that he was "pressured" into signing an incomplete agreement by "fear of losing my business and livelihood" (Def.'s Resp., Ex. 1) does not help him.  Under *McKinney*, Defendant must show that he was subjected to "fraud, misrepresentation, or deceit," and in any case, his signing of the Offering Circulars over six months before executing the Agreements themselves undercuts any suggestion of last-minute pressure.  Finally, Defendant's argument that even the five-page version of the Agreement is invalid because there was no consideration[11] is plainly incorrect.  The authority cited by Defendant, *Texas Gas Util. Co. v. Barrett*, 460 S.W.2d 409 (Tex. 1970), has been cited extensively by Texas courts for the principle that "where no other consideration is shown, mutual obligations by the parties to the agreement will furnish a sufficient consideration to constitute a binding contract."  *Id.* at 412.  Defendant does not deny that the Agreements set forth mutual obligations by the parties.  The Court finds that the forty-five page version of the Franchise Agreement is valid and governs the contractual relationships between Plaintiff and Defendant.

### *Is Defendant Fred Schulz bound by the Agreements?*

The Court must now determine whether Defendant, the individual Fred Schulz, or some other party incurred contractual obligations to Plaintiff under the three forty-five page Agreements.  Defendant contends that he signed the Agreements on behalf of the Truck Store, Inc. in his official capacity as company President, not as an individual.  Upon examining the Agreements, the first page of each indicates "Fred Schulz dba The Truck Store Inc. #1" as the Franchisee (the second and third Agreements refer to The

---

[11] Page four of the Agreement, which appears even in the five-page version, states that "[i]n consideration of the Franchise granted herein, Franchisee shall pay to Franchisor upon execution of this Agreement, a franchise fee of zero dollars."

9

Truck Store Inc. #2 and #3, respectively).  The last page bears the signature of "Fred Schulz" and the title "President" directly underneath, with no reference to the Truck Store or any other company.

Unfortunately for Defendant, under Texas law, "adding 'd/b/a' to a name does not constitute the creation of a separate legal capacity; rather, it is a term of identification." *Matice Enters., Inc. v. Gibson*, No. 01-04-00913-CV, 2005 WL 1838018, at *5 (Tex. App. Aug. 4, 2005); *Lamberg v. Dealers Elec. Supply, Inc.*, 629 S.W.2d 61, 64 (Tex. App. 1981) (Guittard, C.J., dissenting) ("Of course, as a matter of law, 'd/b/a' does not indicate a separate legal capacity, and an individual doing business in an assumed name may be sued as an individual on any debt incurred in that name.").  Defendant submits no evidence other than his own affidavit confirming his alleged intent to execute the Agreements on behalf of the Truck Store, Inc.

In any case, it is indisputable that Defendant signed a personal Guarantee and Assumption of Obligations (made out to "Fred Schulz, an individual") attached to each Agreement.  *E.g.*, Agreement No. 1 at A1-A2.  By signing the Guarantees, Defendant agreed to be "personally bound by, and personally liable for the breach of each and every provision in the Agreement," including monetary obligations.  *Id.* at A1.  Furthermore, Defendant's personal liability under the guarantees is not "contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person"; in other words, even if the Truck Store, Inc. were the proper Franchisee, Plaintiff would not be obligated to sue the company before suing Defendant.

The Agreements and the Guarantees appended thereto clearly indicate Defendant's liability for any breach of the contractual Franchisee's obligations to

10

Plaintiff, the Franchisor.[12]  Therefore, the first element of breach of contract has been established: a valid contract between the parties.

### *Plaintiff's performance under the contract*

The second element of breach of contract in Texas is the plaintiff's performance or tendered performance under the contract.  Plaintiff has submitted a set of invoices and a summary thereof, detailing shipments made between July and December 2005 to the three store locations for which Plaintiff was never paid.  Pl.'s Mot. Summ. J., Exs. 6-7. Defendant has introduced no evidence to suggest that Plaintiff did not actually make these shipments.  Additionally, the Notice of Intent to Terminate (dated March 1, 2006) and the Notice of Termination (dated April 13, 2006) indicate Plaintiff's compliance with the contractual requirement that Franchisor give Franchisee written notice of any failure or refusal to pay amounts due, and allow at least ten days for Franchisee to cure its default.  Because these facts are undisputed, the Court finds that the second element of breach of contract has been satisfied.

### *Defendant's breach of the contract*

Third, Plaintiff must show as a matter of law that Defendant breached the Agreements.  As it is undisputed that the invoices submitted by Plaintiff with its summary judgment motion remain unpaid, it appears that some party has breached its contractual obligation to pay amounts due on shipments of Line-X products.  *See supra* note 8.  Defendant does not appear to contest his liability (around $13,000) for the Line-

---

[12] The Court also rejects any suggestion that the misspelling of Defendant's last name as "Schultz," rather than "Schulz," on the Agreements affects their validity.  The error is merely typographical, and does not undermine the clear intent of Defendant to enter into three franchising agreements with Plaintiff. *See, e.g.*, *Ussery Invs. v. Cannon & Carpenter, Inc.*, 663 S.W.2d 591, 593 (Tex. App. 1983) (writing with regard to an error in a restrictive covenants instrument that "[o]bviously, this typographical mistake must yield to the well-established doctrine that written contracts will be construed according to the intention of the parties, notwithstanding errors and omissions, by perusing the entire document and to this end, words, names, and phrases obviously intended may be supplied.").

X products shipped by Plaintiff to Store #3, which Defendant claims was sold in May 2006. As to the rest of the outstanding debt, however (around $83,000), Defendant argues that it is the Fitzgeralds who are liable for those goods.

It seems, however, that Defendant's alleged sale of the first two store locations to the Fitzgeralds itself violated the Agreements. The Court has already ruled that the full-length, forty-five page version of the Agreement controls each of the three contractual relationships between Plaintiff and Defendant. Section XIX of that Agreement governs "Transferability of Interest," including Defendant's sale, assignment, transfer, conveyance, gift, or encumbrance of his interest in the Agreement to any person, firm, corporation or other entity. Agreement No. 1 at XIX.B1. Each Agreement mandates that Defendant, as Franchisee, obtain "Franchisor's prior written consent" before transferring the franchise to another party. *Id.* Without this written consent, "[a]ny purported assignment of any of Franchisee's rights herein not having the aforesaid consent shall be null and void and shall constitute a material default hereunder." *Id.*

Under the Agreements, therefore, Defendant was obligated to notify Plaintiff in writing before selling any of the stores to a third party.[13] Neither party has submitted any writing resembling such a notice. Defendant asserts that the Line-X representative, Andrew Huber, knew of the transfer and continued to take orders from the new owners of Stores #1 and #2, the Fitzgeralds. According to Defendant's affidavit of August 3, 2007,

---

[13] Although Plaintiff has not discussed these in its summary judgment motion, the Agreements appear to set forth other requirements associated with any transfer of Franchisee's interest. For example, the transferee(s) must execute the [Franchise] Agreement and/or a written assignment "[f]rom Franchisee in a form satisfactory to Franchisor, wherein transferee shall assume all of Franchisee's obligations hereunder." *Id.* at XIX.B.2.b(3). Franchisee must also pay to Franchisor a transfer fee in the amount of $7,500 at the time of transfer, *id.* at XIX.B.3, and must promptly notify Franchisor of any offer to buy the franchise, or any offer to sell the franchise. *Id.* at XIX.C. There is no evidence that the Fitzgeralds executed the Agreement or a written assignment; that Defendant paid a transfer fee; or that Defendant notified Plaintiff either of an offer by the Fitzgeralds to buy the two store locations, or his offer to sell the stores to the Fitzgeralds.

12

"[Huber] advised me that he would take care of doing all the paper work to ensure that I would not be responsible for payment for any product sold to the Fitzgerald Brothers at the two locations being purchased by the Fitzgerald Brothers." Def.'s Resp., Ex. 1 at 2. Plaintiff counters that "[a]t this time LFDC cannot determine whether such a conversation ever did take place. However, LFDC would simply point out that even if the conversation took place, it is irrelevant to Schulz's liability." Pl's Reply 3.

Plaintiff appears to argue that even if it had approved a transfer of any of the store locations, Defendant would still be obligated to pay for any Line-X products purchased during the five-year term of the Agreements. In the Court's view, the Agreements do not support Plaintiff's reading, but rather indicate only that in the event of a valid transfer, Franchisee would still have to perform its *pre-transfer* obligations to Franchisor.[14] However, the Court simply cannot find that Defendant has introduced enough competent summary judgment evidence to create a fact issue as to the validity of the sale to the Fitzgeralds.

Defendant presents only his own affidavit, signed on the day that his Response was filed and to which the Court does not necessarily assign great weight, to support his contention that Line-X representatives were aware of the sale of two store locations. Defendant has submitted no statements from the alleged purchasers of any of the stores, the Line-X representatives, or even his own deposition of July 25, 2006 to bolster his story. It has long been established that conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533

---

[14] Plaintiff cites to Section XIX.B.2.b(4), which states in relevant part that "[a]pproval by Franchisor of any transfer by Franchisee of the franchise herein granted or any of Franchisee's rights under this Agreement shall in no way be deemed a release by Franchisor of Franchisee's obligations pursuant to this Agreement."

13

(5th Cir. 1994). In the Court's view, Defendant's claims regarding the events surrounding his transfer of the Line-X store locations amount to little more than unsubstantiated assertions, and do not create a fact issue defeating summary judgment. Further, Defendant has by no means persuaded the Court that even if a Line-X representative were aware of the sale of the two store locations, Defendant would be relieved of his contractual obligation to obtain Plaintiff's *prior written consent* to the sale. For these reasons, the Court concludes that Defendant did not comply with the provisions of the Agreements governing transferability of interests, and that the sale of the two store locations was null and void under the Agreements.

Therefore, Defendant remains contractually liable for amounts due and owing to Plaintiff during the life of the Agreements, until valid transfers are completed. The Court recognizes the difficult position in which Defendant is now placed, and does not wish to suggest that it suspects improper or malicious motives on Defendant's part during the relevant transactions. Rather, the Court fears that Defendant has simply engaged in careless, uninformed business dealings. The fact remains, however, that three valid contracts bind Plaintiff and Defendant, and that no valid contract binds Plaintiff to any other party with regard to the outstanding debt at issue.

### *Plaintiff's damages*

The last element that Plaintiff must prove is that it has suffered damages as a result of Defendant's contractual breach. Plaintiff has submitted a set of unpaid invoices, demonstrating that it shipped Line-X products to the three store locations between July and December 2005 for which a total of $96,908.39 remains due and owing. Pl.'s Mot.

14

Summ. J., Exs. 6-7.  Defendant has not contradicted this evidence.  Therefore, the Court finds that Plaintiff has satisfied the damages element.

Plaintiff has demonstrated that it is entitled to summary judgment on the issue of breach of contract.  The Court awards judgment to Plaintiff in the total amount due and owing on the unpaid invoices, $96,908.39.

*Interest*

The Court also finds that Plaintiff is entitled to prejudgment interest, under Section XI.B of the Agreements.  *See supra* note 9.  Section XI.B provides that amounts due "shall bear interest after due date at the one and one-half percent (1.5%) per month or the highest applicable legal rate for open account business credit allowed under applicable law."  Under TEX. FIN. CODE § 303.009, the maximum applicable rate appears to be 18% a year.  Plaintiff is instructed to calculate the pre-judgment interest due using the lesser of the contractual interest rate and the maximum legal rate, and to set forth the correct amount on a final judgment.

Furthermore, Texas law mandates the application of post-judgment interest.  *See* TEX. FIN. CODE ANN. § 304.001 (Vernon 2006) ("A money judgment of a court in this state must specify the post-judgment interest rate applicable to that judgment."); *Jarrin v. Sam White Oldsmobile Co.*, 929 S.W.2d 21, 25 (Tex. App. 1996) ("Post-judgment interest is recoverable even if the trial court's judgment does not mention it; it is mandated by statute.").  Under TEX. FIN. CODE § 304.002, "[a] money judgment of a court of this state on a contract that provides for interest or time price differential earns post-judgment interest at a rate equal to the lesser of:  (1) the rate specified in the contract, which may be a variable rate; or (2) 18 percent a year."  Again, Plaintiff is

15

instructed to calculate the lesser rate applicable to this case pursuant to Section 304.002, and to set forth that rate on a final judgment presented to the Court.

*Fees and costs*

Plaintiff further seeks recovery of attorneys' fees and costs pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001(8), which provides that **"**[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for an oral or written contract." In addition, Plaintiff points to Section XXVI of the Agreements, under which, as the prevailing party in a judicial proceeding to enforce the Agreements, Plaintiff "shall be entitled to reimbursement of its costs, including reasonable accounting and legal fees, in connection with such proceeding."

The Court appears to have no discretion as to whether fees and costs are awarded, under Texas statutory law and the terms of the Agreements. *See, e.g.*, *Welch v. Hrabar*, 110 S.W.3d 601, 610 (Tex. App. 2003) ("To recover attorney's fees under Chapter 38, a claimant (1) must be represented by an attorney; (2) she must present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) before the expiration of the 30th day after the claim is presented, the opposing party must not tender payment for the just amount owed. . . . When a party proves these three requisite elements, an award of attorney's fees for breach of contract is mandatory, not discretionary.") (internal citation omitted); Pl.'s Mot. Summ. J., Ex. 13 (Affidavit of Charles L. Stinneford establishing the three requisite elements). Therefore, the Court awards costs and fees to Plaintiff.

The Court declines, however, to determine a sum certain of fees and costs. A trial court has discretion in fixing the amount of attorney's fees, which must be reasonable. *E.g.*, *Great Global Assurance Co. v. Keltex Props.*, 904 S.W.2d 771, 776 (Tex. App. 1995); *Caldwell & Hurst v. Myers*, 714 S.W.2d 63, 65 (Tex. App. 1986). In the Court's view, Plaintiff has submitted insufficient evidence to demonstrate that the significant amount of fees requested - $62,581.33 – is reasonable. Plaintiff has provided only an affidavit prepared by counsel, without an indication of the number of hours spent, or a specific breakdown of the charges incurred. To the Court, the instant case does not appear to have presented particularly complicated issues of law, or to have involved burdensome motion practice or extensive discovery. In addition, Mr. Stinneford's affidavit identifies tasks that may not give rise to recoverable fees associated with this litigation (*e.g.*, preparing pre-litigation demand letters). Therefore, Plaintiff is instructed to submit more detailed documentation of its fees and costs to Defendant, and the parties should work together to arrive at a reasonable and equitable amount before seeking further intervention by the Court.

## III.   CONCLUSION

Plaintiff's Motion for Summary Judgment on its breach of contract claim is hereby **GRANTED**. Plaintiff is awarded judgment in the amount of $96,908.39. Plaintiff must calculate the proper amount of pre-judgment interest and determine the applicable rate of post-judgment interest, and set these forth in a final judgment to be presented to the Court. No final judgment shall be entered, however, until Plaintiff indicates the disposition of its remaining claims. Plaintiff is also entitled to attorneys'

fees and costs; the parties are instructed to work together to determine the reasonable amount of those fees and costs before bringing the matter before the Court.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 23rd day of August, 2007.

*[signature: Keith P. Ellison]*

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT.**